IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PHILLIP YATES,

                              Plaintiff,          Civil Action No.
                                                  9:17-CV-1227 (LEK/DEP)

        v.

DR. DOREEN SMITH,[1]

                              Defendant.

_____

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

PHILLIP YATES, *Pro se*
39 State Street #A
Seneca Falls, NY 13148

FOR DEFENDANT:

HON. BARBARA D. UNDERWOOD        NICOLE E. HAIMSON, ESQ.
New York State Attorney General  Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

---

[1]     The clerk will respectfully be directed to amend the court's records to reflect that the full name of the defendant, who was sued as Dr. Smith, is Dr. Doreen Srnith.

## REPORT AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Phillip Yates, a former prison inmate, pursuant to 42 U.S.C. § 1983. Although plaintiff's complaint asserts additional claims, as a result of the court's order following an initial review, the only cause of action that remains pending is a deliberate medical indifference claim asserted against a physician employed at the facility in which plaintiff was confined at the relevant times.

In response to plaintiff's complaint, defendant has moved for the entry of summary judgment dismissing the medical indifference cause of action asserted against her, arguing that plaintiff failed to exhaust the available administrative remedies before commencing suit. For the reasons set forth below, I recommend that defendant's motion be denied.

## I.    BACKGROUND[2]

At the relevant times prior to his release from incarceration, plaintiff was an inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See*

---

[2]    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2

*generally* Dkt. No. 1. Beginning on or about September 13, 2016, until the time of his release on August 31, 2017, Yates was designated to the Greene Correctional Facility ("Greene") located in Coxsackie, New York. Dkt. No. 17-5; Dkt. No. 17-6 at 3; *see also* Dkt. No. 1 at 2.

Plaintiff alleges that, upon his arrival at Greene, he was denied the use of a cane and sneakers for approximately two months, and, as a result, his toes and feet became infected. Dkt. No. 1 at 2. The complaint alleges that defendant Dr. Doreen Smith refused to treat plaintiff's boils for eleven months. *Id.* Plaintiff was also allegedly denied medication that would have prevented the boils and infections, and denied medication for his nerve damage. *Id.* at 3. According to plaintiff, Defendant Smith also refused to issue Yates a special bathroom pass despite his diagnosis of "3d stage kidney disease." *Id.* at 2-3.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on August 24, 2017, in the United States District Court for the Southern District of New York. Dkt. No. 1. On October 3, 2017, the matter was transferred to this court. Dkt. No. 4. Senior District Judge Lawrence E. Kahn thereafter issued a decision and order, pursuant to 28 U.S.C. §§ 1915(e), 1915A, granting plaintiff's *in forma pauperis* application and dismissing all of the claims asserted in

plaintiff's complaint, except the Eighth Amendment medical indifference course of action asserted against defendant Smith. Dkt. No. 10.

On April 2, 2018, defendant Smith filed a pre-answer summary judgment motion seeking dismissal of plaintiff's remaining claim.[3] Dkt. No. 17. In support of her motion, defendant Smith argues that plaintiff has not fully exhausted the available administrative remedies in accordance with the PLRA because, while plaintiff filed at least two grievances related to the denial of medical treatment, the DOCCS Central Office Review Committee ("CORC") has yet to render a decision concerning those grievances despite the fact the plaintiff's appeals have been pending for

---

[3]    While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no similar rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al.*, *Federal Practice & Procedure* § 2718 (4th ed.). Most courts that have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See Rashidi v. Albright*, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see Poe v. Cristina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, defendant's time to answer plaintiff's complaint is stayed until fourteen days after a final determination is issued with respect defendant's pending motion in the event that the action survives. *Snyder v. Goord*, 05-CV-1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.) (unpublished opinions appended to this report for convenience of *pro se* plaintiff).

more than a year. Dkt. No. 17-2. On April 9, 2018, plaintiff filed an affidavit in opposition to defendant's motion. Dkt. No. 20. Based on the contents of plaintiff's response, the court directed defendant Smith to file copies of all grievances filed by plaintiff during 2016 and 2017 while plaintiff was confined in Greene. Dkt. No. 22. Defendant complied with my order, and plaintiff thereafter filed a sur-reply in further opposition to defendant's motion. Dkt. Nos. 23, 24.

Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg.*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary

judgment appropriate only when "there can be but one reasonable

conclusion as to the verdict").[4]

> B.    Exhaustion of Available Administrative Remedies

The sole basis for defendant's dismissal motion is her assertion that

plaintiff did not fully exhaust the available administrative remedies prior to

commencing this action. Dkt. No. 17-2.

---

[4]    It is also worth noting that rule 7.1(a)(3) of the local rules of practice for this court provide, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). In this case, defendant's motion was accompanied by a statement of undisputed material facts, as required by the court's local rules. Dkt. No. 17-1. Although plaintiff has responded in opposition to defendant's motion, he has not submitted a responsive statement of material facts. Dkt. Nos. 20, 24. Because plaintiff was warned of the consequences of failing to respond to defendant's statement of undisputed facts, Dkt. No. 18 at 2, but has nonetheless failed to do so, I recommend that the court deem the facts contained in defendant's statement of facts as having been admitted to the extent that they are supported by accurate record citations. *See, e.g., Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.); *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's statement, the court is required to resolve any ambiguities in favor of the non-movant. *Terry*, 336 F.3d at 137.

1.    <u>Governing Legal Standard</u>

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. 1850 at 1856. Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43

(2d Cir. 2007).[5]

In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[6] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of

---

[5]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

[6]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[7] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his

---

[7]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8]  *Ross*, 136 S. Ct. at 1859-60. Under the first,

---

[8]        According to the Second Circuit, "the three circumstances discussed in *Ross* do

"an administrative procedure is unavailable when (despite what
regulations or guidance materials may promise) it operates as a simple
dead end – with officers unable or consistently unwilling to provide any
relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative
scheme might be so opaque that it becomes, practically speaking,
incapable of use." *Id.* The Court explained that, "[i]n this situation, some
mechanism exists to provide relief, but no ordinary prisoner can discern or
navigate it." *Id.* The third scenario in which administrative remedies are
deemed unavailable to prisoners is when "prison administrators thwart
inmates from taking advantage of a grievance process through
machination, misrepresentation, or intimidation." *Id.* at 1860.

2.    Analysis

The record in this case reflects that plaintiff filed the following
grievances during 2016 and 2017 while confined at Greene:

| Grievances Filed | |
|---|---|
| Grievance No. | Subject |
| GNE-9007-16 | Failure to treat serious medical needs |
| GNE-9200-17 | Failure to enroll plaintiff in programming |
| GNE-9248-17 | Denied access to bathroom |

not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

| GNE-9267-17 | Failure to provide proper medications |
| GNE-9315-17 | Denial of food and medications |

Of those five grievances, GNE-9248-17 and GNE-9315-17 were not appealed to the CORC because it appears that plaintiff withdrew them. Dkt. No. 23-4 at 5; Dkt. No. 23-6 at 2. A third grievance, GNE-9200-17, was appealed to the CORC on February 16, 2017, but is not implicated in this case. *See* Dkt. No. 23-3. The remaining two grievances, GNE-9007-16 and GNE-9267-17, are relevant to plaintiff's claims in this action.

In connection with the first, GNE-9007-16, filed on October 11, 2016, unfavorable results from the IRGC and superintendent were appealed to the CORC on November 30, 2016. Dkt. No. 23-2 at 13. As to the second, GNE-9267-17, which was initially filed on April 7, 2017, plaintiff filed an appeal to the CORC on June 2, 2017. Dkt. No. 23-5 at 20. According to defendant's submissions, as of May 11, 2018, the CORC has not acted on either of those appeals. Dkt. No. 17-6 at 3-4; Dkt. No. 23.

At this juncture, I find that there is a dispute in the record concerning whether plaintiff fully exhausted the administrative remedies concerning the complaints of inadequate medical care now alleged against defendant Smith before commencing this action. Specifically, in support of her motion

for summary judgment, defendant has offered a declaration from Rachel Seguin, the DOCCS's IGP Assistant Director. Dkt. No. 17-6. In her declaration, Seguin states that the CORC has not issued a response to either GNE-9007-16 or GNE-9267-17. Dkt. No. 17-6 at 3-4. In opposition to defendant's pending motion, however, plaintiff contends that he did fully exhaust the IGP. Dkt. No. 20 at 5. Given this dispute of material fact, the court cannot render a determination concerning whether plaintiff exhausted his administrative remedies without conducting an evidentiary hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011).

Even assuming that defendant could establish that plaintiff failed to exhaust administrative remedies, however, I nonetheless recommend denial of the pending motion. As was indicated above, the Supreme Court has noted that the PLRA only applies to administrative procedures that are truly available to an inmate. *Ross*, 136 S. Ct. at 1858. Under the IGP, as was previously noted, the CORC is required to render a decision concerning an appeal within thirty days of its receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii). In this case, the first of the two grievances (GNE-9007-16) filed with respect to plaintiff's medical treatment has been pending before the CORC since November 22, 2016. Dkt. No. 23-2 at 13. Plaintiff filed his appeal to the CORC regarding the second grievance

(GNE-9267-17) complaining of inadequate medical treatment on June 2, 2017. Dkt. No. 23-5 at 20. Defendant has offered no explanation for the CORC's lengthy delays in adjudicating the appeal. To countenance the CORC's delays in responding to plaintiff's appeals in this action may serve to encourage the DOCCS to withhold decisions for extraordinary periods of time (or indefinitely), thereby thwarting an inmate's ability to satisfy his PLRA exhaustion requirement and file a civil rights lawsuit.

Also absent from defendant's motion is any contention that the IGP provides a remedy to the situation in which plaintiff now finds himself. Indeed, the governing regulations do not contemplate what steps an inmate must take when he does not receive a response from the CORC within the thirty-day timeframe outlined in 7 N.Y.C.R.R. § 701.5(d)(2)(ii). To be sure, although the IGP allows an inmate to inquire with the IGP supervisor to confirm receipt of his appeal by the CORC, the regulations do not provide an avenue for an inmate to pursue when the CORC fails to respond within the timeline mandated under the rules. 7 N.Y.C.R.R. § 701.5(d)(2)(i). For this reason, I find that the IGP was not functionally available to plaintiff in this case and that plaintiff should therefore be excused from the PLRA's exhaustion requirement. *See Williams*, 829 F.3d at 126 (concluding the IGP was not available to the plaintiff where "the

regulations plainly d[id] not describe a mechanism" for pursuing his grievance); *Winfield v. Derosso*, No. 07-CV-4570, 2018 WL 2729237, at *7 (E.D.N.Y. May 14, 2018) (rejecting the defendants' exhaustion defense because the prison's grievance rules did not provide any guidance for "what an inmate should do if he [did] not receive a response to his grievance within [the specified timeframe]"); *Rodriguez v. Reppert*, No. 14-CV-0671, 2016 WL 6993383, at *2-3 (W.D.N.Y. Nov. 30, 2016) (finding the IGP unavailable to the plaintiff for purposes of the PLRA because the CORC failed to issue a response to the plaintiff's grievance appeal until two months after the thirty-day deadline provided for in the governing regulations had expired); *Peoples v. Fischer*, No. 11-CV-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 3, 2012) (finding that the plaintiff was excused from the PLRA exhaustion requirement because the CORC's time to respond under the IGP had expired by the time the plaintiff commenced the action); *Torres v. Carry*, 672 F. Supp. 2d 338, 345 (S.D.N.Y. 2009) ("Although the Court cannot find that [the plaintiff] actually exhausted his administrative remedies, given the lack of a final decision from the CORC, because [the plaintiff] has complied with all of the administrative requirements and made a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal

court simply because the final administrative decision maker has lost [the plaintiff]'s appeal or has otherwise neglected, almost four years after [the plaintiff] claims he filed his appeal, to issue a final administrative decision.").

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Defendant has moved for summary judgment dismissing plaintiff's remaining medical indifference claim, arguing that he failed to exhaust available administrative remedies before commencing suit. The parties' submissions regarding that motion reflect a sharp disagreement as to whether plaintiff did, in fact, fully exhaust the available IGP before commencing suit. Regardless of whether he did, I find that the IGP was not functionally available to plaintiff in light of the CORC's failure to render a response to plaintiff's appeals of GNE-9007-16 and GNE-9267-17 for more than a year. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 17) be DENIED in all respects; and it is further

ORDERED that the clerk is respectfully directed to amend the court's records to reflect the full name of the remaining defendant as Dr. Doreen Smith; and it is further

17

ORDERED that defendant's time to answer plaintiff's complaint is hereby stayed until fourteen days after a final determination is issued with respect to defendant's pending motion in the event the motion is denied.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[9] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    July 10, 2018
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

[9]    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendatoin was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2018 WL 2729237
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Joaquin R. WINFIELD, Plaintiffs,
v.
Robert DEROSSO, Sgt. John Doe, Sgt.
Nicholas Desimone, Wesley Bednosky,
Dennis Horl, & Suffolk County, Defendants.

CV 07-4570 (JMA)(AYS)
|
Signed 05/14/2018

**Attorneys and Law Firms**

Joaquin R. Winfield, Dannemora, NY, pro se.

Kyle O. Wood, Suffolk County Department of Law,
Hauppauge, NY, for Defendants.

**REPORT AND RECOMMENDATION**

ANNE Y. SHIELDS, United States Magistrate Judge

**\*1**  Plaintiff Joaquin R. Winfield ("Winfield" or
"Plaintiff") commenced this civil rights action pursuant
to 42 U.S.C. § 1983 ("Section 1983"), alleging that he
was physically abused and denied appropriate medical
care while imprisoned at the Suffolk County Correctional
Facility (the "SCCF"). The incident forming the basis
of Plaintiff's claims is alleged to have taken place on
October 28, 2005, when Plaintiff was in the custody of the
SCCF. Named as Defendants are Robert DeRosso, Sgt.
John Doe, Sgt. Nicholas DeSimone, Wesley Bednosky,
Dennis Horl, and the County of Suffolk (collectively
"Defendants").

Defendants moved for summary judgment based upon
Plaintiff's alleged failure to exhaust administrative
remedies as required by the Prison Litigation Reform
Act, 42 U.S.C. § 1997e(a) (the "PLRA"). That motion
was referred to this Court, which recommended that
it be denied, and that a factual hearing be held.
That recommendation was adopted by the Honorable
Joan M. Azrack, and the hearing was referred to
this Court for report and recommendation. This Court
thereafter held the hearing on the issue identified in the

summary judgment decision. This constitutes the Court's
recommended findings following that hearing.

BACKGROUND

I. The October 28, 2005 Incident Forming the Basis of
the Complaint

Plaintiff's claim arises out of an incident that allegedly
took place on October 28, 2005 at the SCCF. Plaintiff
alleges that on the date of the incident he was outside for
recreation time when a corrections officer by the name of
Robert DeRosso ("DeRosso") began to yell at Plaintiff
about a complaint he sent to Albany earlier that year. He
states that while recreation time had not ended, DeRosso
handcuffed him and took him to a separate area where he
and another correction officer, wearing a badge displaying
the number 524, grabbed Plaintiff, pushed him to the
ground, and then stomped on and kicked him. Plaintiff
was then put into an elevator cage, where he was once
again assaulted, which resulted in Plaintiff receiving a
bloody nose and lip, cranial contusion, and two loosened
teeth. Plaintiff was brought back to his cell, where he
claims a lieutenant with badge number 154 used his foot
to put pressure on Plaintiff's head. Although Plaintiff was
seen by a nurse shortly after the incident, he claims that he
was denied pain reliever, ice, and bandages, and that his
medical condition was not properly logged. DE 54, pages
11-15.

II. Procedural History

A. Proceedings Prior to Summary Judgment Motion
As noted, the incident forming the basis of this action took
place at the SCCF on October 28, 2005. Winfield filed
his original complaint on October 25, 2007. See DE 1. He
thereafter moved to amend on December 13, 2009. That
motion was made to the then-assigned Magistrate Judge,
the Honorable Arlene R. Lindsay. See DE 54. Magistrate
Judge Lindsay denied the motion, as it should have been
made to the District Judge. Order dated December 18,
2009. On July 15, 2010, Winfield filed a motion to the
Honorable Thomas C. Platt, the then-assigned District
Judge, seeking a pre-motion conference with regard to his
motion to amend. DE 76. On January 24, 2011, Judge
Platt deemed the motion moot, as he no longer held pre-
motion conferences, and directed the Plaintiff to file a
motion if he wished to amend his pleadings. DE 94. By
letter dated March 16, 2011, Plaintiff moved to amend

the Complaint to add Suffolk County as a Defendant. DE 97. The motion was granted as unopposed. [1] DE 108. The Amended Complaint additionally sought to add Suffolk County as a party, and identified several of the Doe defendants. On June 20, 2011, the motion to amend the complaint was granted. DE 108. [2] On January 2, 2013, Plaintiff once again filed a motion to amend, seeking to add additional parties. DE 117. On March 22, 2013, the District Court denied the request, and further informed the Plaintiff that it would not accept any further amendment. DE 124. Plaintiff filed an interlocutory appeal of Judge Platt's March 22, 2013, which was dismissed by the Second Circuit for lack of finality. DE 132. On May 31, 2013, Defendants answered the Amended Complaint, and asserted, inter alia, 42 USC Section 1997 as an affirmative defense.

**\*2** On July 8, 2014, this case was reassigned to the Honorable Sandra J. Feuerstein. Approximately six months later, on January 16, 2015, it was reassigned to the Honorable Joan M. Azrack.

### B. Motion for Summary Judgment

On September 24, 2015, Defendants filed a fully briefed motion for summary judgment. DE 185. Defendants' motion for summary judgment was referred to the previously assigned Magistrate Judge, and later to this Court for Report and Recommendation. See Order dated January 6, 2016; Order dated May 18, 2016; DE 198 (reassignment memo). In a Report and Recommendation dated July 8, 2016, (the "2016 R&R") this Court held that a question of fact as to exhaustion precluded summary judgment.

At the summary judgment phase, this Court noted that Defendants' position rested on the argument that Plaintiff failed to file a grievance as to the incident forming the basis of this lawsuit within the five day period required by the relevant rules. Thus, it was argued that there was no evidence that Plaintiff commenced the grievance process with respect to the October 28, 2005 incident on or before November 2, 2005. In support of their argument, Defendants submitted affidavit testimony showing that while Plaintiff had complained of other incidents, both before and after the October 28, 2005 incident, a search of their files revealed no grievance filed with respect to the incident here. For his part, Plaintiff submitted, inter alia, both handwritten and typed letters addressed to the

Inmate Grievance Coordinator dated August 27, 2007, and a typed letter dated September 24, 2007, stating that he never received a response to a grievance dated October 31, 2005, and timely filed on November 2, 2005.

In view of the parties' divergent factual positions it was recommended that Defendants' motion be denied, and that a hearing be held. DE 204. Defendants appealed the recommended denial of summary judgment to the District Court, DE 210, and that Court later adopted the 2016 R&R. DE 215. The hearing contemplated by the 2016 R&R was thereafter referred to this Court, see Order dated May 19, 2017, and the hearing was held on August 17, 2017. DE 244. On October 27, 2017, Defendants submitted their post-hearing submissions. DE 247. Plaintiff was provided with that submission, as well as a transcript of the hearing. He has submitted documents in opposition to that submission. DE 248; 252; 253-57. Plaintiff's last submission filed in support of his position is dated March 26, 2018. DE 258. This matter is now fully submitted.

### THE HEARING

### I. The Witnesses

Three witnesses testified at the hearing. Defendants presented the testimony of Former Corrections Sergeant Nicholas DeSimone ("DeSimone"), who is a named defendant herein, and Officer Craig Rosenblatt ("Rosenblatt"). Plaintiff testified on his own behalf.

DeSimone testified regarding his personal knowledge of this matter, as well as his knowledge of the SCCF grievance procedures. DeSimone is a now-retired Suffolk County Corrections Sergeant who worked at the SCCF from 1990 through his retirement in 2014. Transcript of Hearing dated August 17, 2017 ("Tr.") at 6:4-5. From 2000 to 2008, DeSimone worked directly with inmates, starting as a housing sergeant who was in charge of a single floor, to "pod" sergeant in charge of the medium security facility, to first floor or building sergeant. Tr. 6:22-7:11. In 2008, DeSimone moved to an administrative position, becoming the grievance supervisor. Tr. 7:15-16.

**\*3** Rosenblatt testified as to his knowledge of SCCF, and New York State prison grievance procedures. Rosenblatt is currently employed by the Suffolk County Sheriff's Office. Tr. 23:6-7. Over his twenty year tenure with that

department, he served as a housing unit officer, and with the inmate visitation unit. Tr.23:10-16. From 2010 until July of 2016, Rosenblatt worked as the inmate grievance coordinator. Tr. 23:17-18. In that capacity, Rosenblatt was responsible for processing inmate grievances in accord with New York State minimum standards. As such, he was familiar with the grievance process in effect at the SCCF during 2005, the time period relevant to this matter. Tr. 24:2-6.

Plaintiff testified on his own behalf regarding his personal knowledge of facts relevant to the hearing.

## II. The 2005 Grievance Process

Both DeSimone and Rosenblatt testified in detail as to the 2005 grievance procedure at the SCCF. Their testimony was in accord with the procedures set forth in the Inmate Handbook provided to all inmates upon entrance to the SCCF (the "Handbook"). The Handbook was admitted into evidence as Exhibit F. Based upon the testimony developed at the hearing, this Court finds that Plaintiff received a copy of the Handbook upon his admission to the SCCF. See Exhibit G (booking sheet acknowledging Plaintiff's receipt of the Handbook).

The testimonies of DeSimone and Rosenblatt were consistent with each other, and with the grievance procedures set forth in the Handbook. The Court finds that both witnesses testified credibly about those procedures, as follows. According to both the witnesses' testimony, and the Handbook, all inmate grievances must be pursued within five days of the act or occurrence giving rise to the complaint. Exhibit F at 13. The first step in that process in an informal attempt to resolve any issue with the inmate's housing officer. Exhibit F at 13; Tr. 24:21-23. If the issue is not resolved at that level, the inmate is provided with an informal grievance form. The Handbook provides that the grievance form "will be forwarded" to the unit housing sergeant, who will attempt to resolve the matter. In the event the matter is not resolved, the grievance is then escalated to the grievance coordinator. Exhibit F at 13; Tr. 15:7-12; Tr. 24:21-25. It is the housing sergeant who forwards the grievance to the person responsible for the next level of review, i.e., the Grievance Coordinator. The Handbook states that the Grievance Coordinator will investigate the complaint, and that the inmate "will receive a written determination form the Grievance Coordinator within 5 business days." Exhibit F at 13. The inmate is then given 2

days to submit any additional information sought. If the inmate does not agree with the decision of the Grievance Coordinator, he has two days to appeal that decision to the Chief Administrator of the Facility, who will provide a written determination within five days. Id. The inmate then has three days in which to appeal an adverse decision to the State Commission of Correction (the "State Commission"). Id. The Grievance Coordinator is charged with forwarding any appeal to the State Commission within three business days of receipt of the inmate's appeal. Id. Unlike earlier steps of the grievance process, the inmate is provided a written receipt of the Grievance Coordinator's receipt of the inmate's appeal. Thereafter, the State Commission renders a written decision as to the grievance within forty-five days, at which time the inmate is notified, by the Commission, of the decision. Id.

Every grievance commenced by an inmate is given a grievance number, which is assigned by the inmate grievance coordinator. That number appears on both the informal and formal grievance forms. Tr. 25:7-11; 16. See e.g., Exhibits B and C. Assignment of a grievance number takes place without regard as to whether the grievance was resolved at the informal stage, or whether it is escalated to the formal grievance level. Tr. 25:18-23. In the event that a grievance is resolved at the informal stage, the informal grievance form would nonetheless be forwarded to the grievance coordinator who then assigns the document a grievance number and retains it in his file. Tr. 26:4-13. If the grievance was not resolved informally, a grievance number is also assigned (and noted on the informal grievance form), and the inmate would be given the formal grievance form to continue the grievance process to the next level. That formal grievance form would bear the same grievance number assigned to the informal grievance form. Tr. 25:18-26:1. In 2005, all grievance forms were maintained, in hard copy, as part of the grievance coordinator's files. Tr. 26:10-16.

 **\*4** The Court questioned Rosenblatt as to the procedure to be followed by an inmate if his informal grievance was not resolved within the five day period provided for in the SCCF rules. This Court also questioned whether the Handbook contained any procedure under the circumstances posited. Tr. 34-37. Rosenblatt stated that in the event that an inmate did not hear about his grievance within five days, he should file a second grievance—alleging a failure to timely respond to the first. Tr. 34:13-35:6. In response to inquiry as to

whether this second grievance procedure appeared in the Handbook, Rosenblatt testified that there was nothing in the handbook stating what an inmate was to do in the event that his grievance was not the subject of a timely response. Tr. 36:11-17. He did state, again, however, that in such a circumstance the inmate should simply file another grievance stating that he had not received a timely response. Tr. 36:23. While Rosenblatt was aware of such circumstances, id.; Tr. 37:5-16, he stated it was an "uncommon thing to get a grievance saying that we didn't follow a procedure or we didn't get something back within five days." Tr. 37:22-24.

### III. Facts Regarding the Search for Plaintiff's Alleged 2005 Grievance

DeSimone testified that he received a letter, received in evidence as Exhibit A, dated August 27, 2007 from Plaintiff (the "August 2007 Letter"). That letter was addressed to the then-inmate grievance coordinator (the "Grievance Coordinator"), and provided to DeSimone to follow up. Tr. 9:9-12. The August 2007 Letter states that Plaintiff "submitted" an inmate grievance form with regard to the facts forming the basis of this lawsuit on November 2, 2005, and that he never received a reply. Ex. A. In the August 2007 Letter, Plaintiff seeks guidance with respect to the grievance, asking whether he was supposed to "file a timely administrative appeal to the disciplinary action review board/committee or perhaps file a undelayed complaint of any type of Internal Affairs Bureau or something?" Ex. A. He also states his apparent understanding that since "specific instance of assaultive behavior by staff are not grievable, (specifically excluded from the County Jails Inmate Grievance System)" whether another timely recourse was appropriate. Id.

In addition to the August 2007 Letter, DeSimone was provided with a letter dated September 24, 2007, that Plaintiff sent to the Grievance Coordinator (the "September 2007 Letter") (together with the August 2007 Letter, collectively, the "2007 Letters"). The September 2007 Letter refers to an "Unanswered Grievance and Subsequently written inquiry" and states that Plaintiff received no response to his November 2, 2005 grievance complaining about the use of excessive force on October 28, 2005. Exhibit A. Similar to the August 2007 Letter, the September 2007 Letter asks the Grievance Coordinator to answer the submitted grievance, and to state why the grievance was never acknowledged. Id.

When DeSimone received the 2007 Letters he conducted a search of all 2005 grievances, but found no grievance addressing any claim of excessive force filed by Plaintiff. Tr. 9:23-10:4. DeSimone's search included both a database search by grievance number, and a physical search of the entire 2005 files of the facility. Tr. 10:18-20. Plaintiff was advised of the results of DeSimone's search for any 2005 grievance with respect to any claim of excessive force in a letter dated June 23, 2008. In that letter, DeSimone noted first that his office did not receive the 2007 Letters until June of 2008. Exhibit D. DeSimone testified, as set forth in his letter, that a search of all grievances filed in 2005 failed to identify any grievance filed by Plaintiff with respect to a claim of excessive force. Id.; Tr. 12:7-19. DeSimone further testified that he was unaware of any parallel internal affairs investigation with respect to any claim involving his own use of force. Tr. 13:21-25.

While his search did not uncover any grievance with respect to the October 2005 incident of alleged assault, DeSimone did find two other grievances filed by Plaintiff during 2005. Those grievances were admitted into evidence as Exhibits B and C. Those grievances contained detailed handwritten information demonstrating compliance with the grievance procedures described above. Thus, both of the 2005 inmate grievance forms found by DeSimone bear a grievance number. Moreover, each step of the grievance process with respect to those grievances is recorded first on an "informal grievance form" and thereafter on a "formal grievance form." See Exhibits B and C. In particular, the informal grievance forms for Plaintiff's 2005 grievances set forth his grievances (both of which referred to lack of law library access). Each grievance form notes that the grievance was neither resolved informally nor at the Housing Sergeant level. Both of these steps are noted to have been taken on the same day that the grievance was raised by Plaintiff. Two days after these steps failed to resolve Plaintiff's grievances, Plaintiff is stated to have been supplied with formal grievance forms. Those formal grievance forms are each dated within two days of the failure to resolve Plaintiff's grievances at the informal level. See Exhibits B and C.

### IV. Plaintiff's Testimony

**\*5** Plaintiff's testimony focused on a grievance complaint form in evidence as Exhibit E. Exhibit E is the informal

grievance form that Plaintiff states was completed and timely submitted after the October 28, 2005 incident forming the basis of the complaint herein. That form is dated October 31, 2005 (hereinafter referred to as the "October 31, 2005 Grievance Form"). It states that on October 28, 2005, between 8:30 and 9:00 A.M. "rec ending early," a correction officer identified as Defendant DeRosso, and at least three other corrections officers "kicked, punched and slapped [plaintiff] countless times while cursing [plaintiff] profanely". This attack is alleged to have been followed by a denial of medical attention. Exhibit E. There is no question but that the October 31, 2005 Grievance Form is written in Plaintiff's handwriting. Defendant does not argue otherwise, and the Court observes that Plaintiff's handwriting is consistent with that appearing on his 2005 grievance forms produced by Defendants. There is also no question but that if the October 31, 2005 Grievance Form was actually filed on the date that Plaintiff states, it would have be a timely filing with respect to the incident forming the basis of this complaint.

Questions arose at the hearing as to the filing of the October 31, 2005 Grievance Form because, unlike the 2005 grievances submitted by Plaintiff (described above and admitted at the hearing as Exhibits B and C), the October 31, 2005 Grievance Form bears no grievance number, and contains no remarks memorializing that any grievance procedure steps were followed.

Plaintiff testified that he filled out the October 31, 2005 Grievance Form after the incident forming the basis of the complaint herein. Thus, he stated that he filled out a blank grievance form and photocopied it at the law library. Plaintiff testified consistently, on direct and cross-examination, that he made two copies of the form in the law library—one to submit at the facility and one to mail to the Suffolk County Grievance Coordinator. His testimony as to what was done with each copy was, however, inconsistent. First, Plaintiff testified that he addressed the form to the Suffolk County Grievance Coordinator and placed it in the mail, Tr. 46:9-22. Plaintiff later stated that he gave the form to an officer to place in the mail. Tr. 47:1-15. On cross-examination, Plaintiff testified that he gave one copy to an officer, and that he mailed the other copy to the Grievance Coordinator. Tr. 50:10-52:10.

Plaintiff reviewed the 2005 grievance forms, marked as Exhibits B and C and admitted that he was familiar with the grievance procedure, but stated that he was not "well versed" in it. Tr. 57:25. The Court asked Plaintiff whether he routinely received any type of receipt when submitting a grievance. Plaintiff stated that no such receipt was ever provided, either for a grievance form or legal mail. Tr. 60:3-25.

Plaintiff was also cross-examined about his August 27, 2007 and September 24, 2007 letters to the grievance coordinator asking about the outcome of his grievance as to the October 28, 2005 event. Tr. 58:7-12. It was clear that the dates of these letters pre-dated this lawsuit (which was commenced in October of 2007), but that the date that Defendant DeSimone stated that the letters were received was June of 2008—after commencement of this lawsuit.

Plaintiff's testimony appeared to raise his concern and confusion as to whether a pending internal affairs proceeding in some way tolled the requirement that a grievance be timely filed. It was clear to the Court that no such toll applies. Thus, even if there were an ongoing internal affairs investigation as to the October 28, 2005 incident, that investigation would not toll the time period for the filing of any grievance.

## DISCUSSION

### I. Legal Principles

As noted in this Court's earlier decision in this matter, DE 204, the Supreme Court has made clear the law to be applied when determining whether a prisoner has exhausted his remedies under the PLRA. See Ross v. Blake, 136 S. Ct. 1850 (2016). Importantly, the Court's refusal to allow for judicially created exceptions to exhaustion, amounts to a rejection of the approach previously adopted by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004), which, inter alia, allowed a court to excuse exhaustion in under certain "special circumstances." Such circumstances were held to include an inmate's misunderstanding of unclear administrative regulations. Hemphill, 380 F.3d at 686, 691 (2d Cir. 2004). While Ross made clear that no "special circumstances" excuse the PLRA's exhaustion requirement, it also noted that statute's "significant" textual qualifier that "the remedies must indeed be 'available' to the prisoner." Ross, 136 S. Ct. at 1856.

**\*6** As the law currently stands, strict adherence to the PLRA exhaustion requirement is necessary and there are only "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use," such as, "when a mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Ross, 136 S. Ct. at 1859. Third, a grievance process is made unavailable, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. Indeed, "interference with an inmate's pursuit of relief renders the administrative process unavailable." Id.

In Williams v. Correction Officer Priatno, 829 F.3d 118 (2d Cir. 2016), the Second Circuit applied Ross and held that a prisoner exhausted his administrative remedies even where there was no record of an appeal of the prisoner's grievance. There, the Court accepted as true the prisoner's position that the officer to whom the grievance was handed never actually filed the grievance. Williams, 829 F.3d at 124. While the procedure at issue in Williams was clear as to how an inmate could appeal a properly filed grievance, it did not clearly outline what a prisoner should do if his grievance was not filed. Id. Thus, the Second Circuit in Williams observed that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed." Id. at 126. Describing "the process to appeal an unfiled and unanswered grievance" as "prohibitively opaque, such that no inmate could actually make use of it," the Second Circuit in Williams held that the plaintiff there had exhausted all available remedies, and therefore his complaint could not be properly dismissed for failure to exhaust. Id. at 126. Significantly, the Williams court commented that "[t]o avoid confusion going forward, we recommend that [the relevant correctional facility] revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff,

and how to appeal a grievance, to which the inmate never received a response, after being transferred." Id. at 126-27.

## II. Disposition of the Motion

This case turns on the Court's perception of the veracity of witness testimony. First, the Court finds that the defense witnesses testified credibly regarding their searches of files and attempts to uncover a timely filed 2005 grievance with respect to the claims raised in this lawsuit. The Court believes that no such grievance was uncovered.

However, the Court also finds that Plaintiff testified credibly as to his attempt to properly file a grievance after the October 28, 2005 incident. While the grievance dated October 31, 2005 is handwritten and bears no grievance number, the Court nonetheless credits Plaintiff's testimony that he did, indeed, take the proper steps to file that grievance in a timely manner. In so finding, the Court notes (as described above) that there were certain inconsistencies in Plaintiff's testimony. The Court's impression of Plaintiff's testimony, however, is that those inconsistencies were more emblematic of confusion, than deception. In particular, the Court does not find that Exhibit E was created years after the October 28, 2005 incident, but was, instead a copy retained by Plaintiff.

This Court's factual finding that Plaintiff properly completed a grievance form which he gave to an appropriate officer, raises the question whether Plaintiff was required to file a second grievance when he was not notified of a disposition of his grievance within the required five day period. In other words, the question is whether the filing of a second grievance, alleging a lack of response to the first, was an available step required to be satisfied to achieve PLRA exhaustion. The Handbook contains no such requirement and the testimony did not establish the availability of this avenue of exhaustion.

**\*7** Importantly, while the Handbook makes clear that a grievance "will be responded to within five days" of filing, it does not state what an inmate should do if he does not receive a response to his grievance within that five day period. While Rosenblatt testified that a second grievance (alleging an untimely response) should be filed, Tr. 34:13-35:6, he was unable to point to such a procedure in the Handbook. Tr. 36:11-17. He further testified that it was an "uncommon thing to get a grievance saying that we didn't follow a procedure or we didn't get something back within five days." Tr. 37:22-24. Thus, while Plaintiff could

have filed a second grievance after not receiving a timely response to the October 31, 2005 Grievance, nothing in the Handbook required the filing of such a second grievance.

Because the Handbook contains no clear procedure instructing an inmate in Plaintiff's circumstances as to the proper course of conduct, the Court holds that the facts in this matter are akin to those in Williams, i.e., "a situation for which the applicable grievance regulations" give "no guidance whatsoever." Williams, 829 F. 3d. at 124. Under such circumstances, the administrative remedies upon which Defendants rely in support of their motion for summary judgment are not "available" within the meaning of the PLRA. Thus, the Court finds that Plaintiff in fact, filed a timely grievance and holds that a second grievance was not an available remedy that the Plaintiff was required to exhaust. Therefore, the motion for summary judgment based upon lack of exhaustion must be denied. [3]

CONCLUSION

For the foregoing reasons this Court recommends that Defendants' motion for summary judgment for failure to exhaust be denied.

OBJECTIONS

A copy of this Report and Recommendation is provided to Defense Counsel via ECF. The Court directs Defendants to serve a copy of this Report and Recommendation by overnight mail and first-class mail to Plaintiff at his last known address(es) and to file proof of service on ECF within two days of this order. Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court of Court of Appeals.** Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

**All Citations**

Slip Copy, 2018 WL 2729237

Footnotes

1    Although the County's motion states the Plaintiff filed an amended complaint adding the County as a defendant on December 13, 2009, DE 184 at 2, that motion to amend was first denied. The County was added on January 24, 2011 when a subsequent motion to amend was granted. It appears that the motion to amend filed under DE 97, requested the Court to grant the motion filed under DE 54. See DE 108. Thus, the Amended Complaint filed under DE 54 is the current Amended Complaint.

2    The Court notes that on the same date the motion to amend was granted, a motion to supplement the Complaint with an attachment regarding the Internal Affairs Bureau, Investigation No. I-43-05, was also granted, DE 97; however, the only document attached to Plaintiff's motion was an affirmation in support of his motion to add Suffolk County. Although the affirmation accompanying the motion to supplement references the I-43-05 report, no such document was attached. DE 97.

3    The Court is aware that certain inmates may create after-the-fact documents to show that they properly commenced the grievance procedure so as to avoid any claim of failure to exhaust. The factual findings and holdings in this matter are particular to this lawsuit, and to the Court's assessment of Plaintiff's credibility as a live witness.

Rodriguez v. Reppert, Not Reported in F.Supp.3d (2016)

2016 WL 6993383

2016 WL 6993383
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Juan Rodriguez, Plaintiff,
v.
C.O. Reppert, C.O. Osbourne,
and C.O. Testani, Defendants.

14-CV-671-RJA-MJR
|
Signed 11/30/2016

**Attorneys and Law Firms**

Juan Rodriguez, Dannemora, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

HONORABLE RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE

**\*1** Magistrate Judge Roemer, to whom the Court referred this case for all pre-trial proceedings, filed a Report and Recommendation (Docket No. 19) recommending that the Court deny the Defendants' motion for summary judgment. *See* Docket No. 10. The Defendants have filed objections to that recommendation. Docket No. 20. Pursuant to 28 U.S.C. § 636(b)(1), the Court must review the Report and Recommendation *de novo*. Upon *de novo* review, and for the reasons stated below, the Court overrules the Defendants' objections and adopts the Report and Recommendation in its entirety.

**BACKGROUND**

The Defendants argue that they are entitled to summary judgment because, they claim, the Plaintiff failed to exhaust his administrative remedies before bringing this case. It is undisputed that the New York State Department of Corrections and Community Supervision's (DOCCS) Central Office Review Committee (CORC)—the final level of review in DOCCS' internal grievance program—did not decide the Plaintiff's appeals of his administrative

grievances within the thirty-day period required by DOCCS' regulations. *See* 7 N.Y.C.R.R. § 701.5(d)(2)(ii). It is also undisputed that the Plaintiff filed his complaint in this case *before* the CORC decided his appeals. The CORC ultimately decided the Plaintiff's appeals two weeks after the Plaintiff filed his complaint in this case, but nearly two *months* after DOCCS' own regulations required the CORC to do so.

Relying primarily on the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), as well as the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118, Judge Roemer concluded that the CORC's failure to timely decide the Plaintiff's appeals, combined with the absence of any "mechanism to request the CORC to issue a decision after thirty days have elapsed," Docket No. 19 at 7, meant that the Plaintiff's administrative remedies were not "available" within the meaning of the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a). Thus, Judge Roemer concluded, the Plaintiff did exhaust his administrative remedies.

**DISCUSSION**

The PLRA's exhaustion "edict contains one significant qualifier: the [administrative] remedies ... a prisoner is required to exhaust "must ... be 'available' to the prisoner." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified several scenarios in which an administrative remedy might be "[un]available" within the meaning of the PLRA. *See id.* at 1859-60. Judge Roemer concluded that one of those scenarios applies in this case: the Plaintiff here encountered "an administrative scheme" that is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859.

The Second Circuit recently explained that this "opaqueness" exception to the PLRA's exhaustion requirement applies when "[t]he regulations simply do not contemplate the situation in which [the prisoner] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016). That is the case here: As Judge Roemer noted, "after the CORC neglected to decide Rodriguez's appeals within thirty days, administrative remedies were no longer available to him, and his only option was to file this action." Docket No. 19 at 7. In other words, there was simply nothing the Plaintiff

could do to force the CORC to follow its own deadline for deciding the Plaintiff's appeals.

**\*2** The Defendants now argue that the Plaintiff "could have contacted the IGP Supervisor in writing if he did not receive a written notice of receipt from CORC within 45 days of his appeal." Docket No. 27 at 2. Specifically, the Defendants point to DOCCS Directive 4040(d)(3)(i) (codified at 7 N.Y.C.R.R. § 701.5(d)(2)(i)), which provides that, "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to the CORC." *Id.* (citations omitted).

This argument, however, was made for the first time in the Defendants' reply brief before this Court; the Defendants did not raise the argument before Judge Roemer, nor did they raise it in their objections. [1] The Defendants have therefore waived the argument that § 701.5(d)(2)(i) provides a mechanism by which the Plaintiff could have prompted the CORC to decide his appeals. "The Court does not and will not make a practice of addressing the merits of issues first raised in a reply, as the opposing party is not afforded any opportunity to respond to new issues raised in a reply, which is ordinarily the last document submitted prior to the Court's ruling on a motion. Such sapience appears all the more prudent" where, as here, "the opposing party is proceeding *pro se.*" *Peca v. Delta Air Lines, Inc.*, No. 97-CV-0882E(M), 2000 WL 914112, at \*2 (W.D.N.Y. July 7, 2000) (citations and quotation marks omitted). The Court will therefore not consider the Defendants' argument that § 701.5(d)(2)(i) makes Plaintiff's administrative remedies "available" within the meaning of the PLRA.

The Defendants also identify several other reasons why they believe Judge Roemer's Report and Recommendation was incorrect. The Court addresses each argument each in turn.

First, the Defendants argue that the Plaintiff's conduct in a case in the New York Court of Claims shows that he "could not ... argue that the grievance process was unavailable to him, unknowable, incapable of use, inaccessible, or practically impossible to navigate." Docket No. 20 at 5. But this argument misinterprets the PLRA's opaqueness exception as interpreted by the Second Circuit in *Williams*: the question, according to

the Second Circuit, is whether "[t]he regulations ... contemplate the situation in which [the prisoner] f[inds] himself." *Williams*, 829 F.3d at 124. This is an objective question: the regulations either provide an inmate with a procedural route to obtain administrative relief, or they do not. To be sure, an inmate's subjective understanding of the grievance procedure is one aspect of the opaqueness question; a procedural scheme that *does* provide a route to administrative relief is little better than *no* route if the administrative path the prisoner must follow is "so confusing that no reasonable prisoner can use them." *Ross*, 136 S. Ct. at 1869 (quotations and ellipsis omitted). *See also Williams,* 829 F.3d at 126 ("[T]he purported options for relief provided by defendants, to the extent they are even available to an inmate in [the plaintiff's] situation, only increase confusion regarding the avenues available to pursue an appeal.") Nothing in *Williams*, however, suggests that the opaqueness exception is categorically unavailable simply because, as here, the prisoner was familiar with his prison's grievance process.

**\*3** Second, the Defendants point to the Supreme Court's statement in *Ross* that, "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross*, 139 S. Ct. at 1859. Again, however, after *Williams*, the question in this case is whether an administrative option was even available to the Plaintiff in the first place—not whether the Plaintiff misunderstood a DOCCS regulation.

Third, the Defendants argue that Judge Roemer "chose ... to apply the minority [ ]view" on the question whether an untimely administrative decision renders the administrative process unavailable. But as Judge Roemer noted, the Defendants do not identify "any cases from the Second Circuit or the Western District of New York" supporting their position. Docket No. 19 at 8. To the contrary, the most recent Second Circuit case on point—*Williams*—states that administrative remedies are opaque—and, therefore, unavailable—when those remedies do not address the situation in which a prisoner finds himself. That is the case here.

Fourth, the Defendants rely heavily on the Supreme Court's statement in *Ross* that the unavailability of administrative remedies "will not often arise." But in context, the Supreme Court's statement says something less forceful than the Defendants suggest: *Ross* states that,

"[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." *Ross*, 136 S. Ct. at 1859. This suggests that remedies will typically not be unavailable under the PLRA because prisons have an obvious interest in resolving administrative grievances internally. This interest is best served by maintaining a grievance scheme that actually provides a route to administrative relief. *Ross*, in other words, assumes that administrative remedies will "not often" be unavailable because *Ross* also assumes that prisons will maintain remedial processes that provide prisoners with a path for obtaining administrative relief.

Finally, the Defendants argue that, "if Magistrate Judge Roemer's decision is adopted, inmates can file suit anytime the IGP, a Superintendent, or the CORC is late in rendering a decision. In fact, if adopted, inmates could wait until one day after the time periods stated in the NYCRR and file suit." Docket No. 20 at 15. This overstates Judge Roemer's conclusion. Nothing in Judge Roemer's Report and Recommendation suggests that a failure to timely decide an inmate grievance at a *lower level* of the grievance review process would permit a prisoner to immediately file a federal lawsuit. This is because DOCCS' regulations expressly contemplate such a situation: they provide that, absent an extension of time, "matters not decided within the time limits may be appealed to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). In other words, a failure to render a timely decision at a lower level in the grievance process gives a prisoner the option of appealing that inaction to the next level. A prisoner who does not avail himself of that option will almost certainly find his lawsuit dismissed for failure to exhaust. *See, e.g.*, *Morrison v. Stroman*, 12-CV-542(A)(M), 2014 WL 6685510, at *4 (W.D.N.Y. Nov. 26, 2014). But the CORC's failure to timely decide an appeal is fundamentally different than, for instance, a superintendent's failure to timely decide an appeal, because the CORC is the final step in DOCCS' internal grievance program. A prisoner whose CORC appeal was not timely decided has no other administrative body to which he can appeal. Thus, the "regulations simply do not contemplate" what the prisoner should do to ensure his appeal is timely decided, "making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams*, 829 F.3d at 124.[2]

**\*4** Thus, upon *de novo* review, the Court overrules the Defendants' objections to Judge Roemer's Report and Recommendation.

Lastly, the Plaintiff objects to Judge Roemer's decision to "stay defendants' time to answer the complaint until the District Judge renders a decision" on the Defendants' motion for summary judgment. Docket No. 19 at 9. This non-dispositive order is neither clearly erroneous nor contrary to law. *See* 28 U.S.C. § 636(b)(1)(A). The Court therefore overrules the Plaintiff's objections.

## CONCLUSION

For the reasons stated above, the Court overrules both the Plaintiff's and the Defendants' objections to Judge Roemer's Report and Recommendation. As directed by Judge Roemer, the Defendants shall answer the complaint within 21 days of this Decision and Order. This case is remanded to Judge Roemer for further proceedings.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6993383

---

Footnotes

1   The Defendants state that they made this argument for the first time in their reply brief because "[i]n response to defendants' objections to the R&R, plaintiff—for the first time—argues that the grievance process was 'opaque' and 'incapable of use.' " Docket No. 27 at 2. The Defendants overlook that *Judge Roemer* concluded that the grievance process was opaque and incapable of use. Thus, the Defendants could—and should—have made this argument in their objections to Judge Roemer's Report and Recommendation.

2   Because the Defendants have waived the argument, the Court does not address whether § 701.5(d)(2)(i) provides a mechanism for a prisoner to continue pursuing his grievance, thereby making his administrative remedies "available" under the PLRA. The Court notes, however, that this provision does not appear to address the situation in which the Plaintiff found himself. The Plaintiff does not suggest that he failed to exhaust because he was unsure whether the CORC

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.    3

**Rodriguez v. Reppert, Not Reported in F.Supp.3d (2016)**
Case 9:17-cv-01227-LEK-ML    Document 26    Filed 07/11/18    Page 29 of 68
2016 WL 6993383

received his appeal. Rather, he failed to exhaust because the CORC did not timely decide the Plaintiffs' appeals. Nothing in the record suggests that the CORC failed to comply with the receipt-and-notice provisions of § 701.5(d)(2)(i).

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
On Reconsideration in Part Peoples v. Fischer, S.D.N.Y., June 26, 2012

2012 WL 1575302
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Leroy PEOPLES, Plaintiff,

v.

Brian FISCHER, Lucien Leclaire, Jr., Docs Office
of Counsel, William Lee, Peter A. Crusco, Eric C.
Rosenbaum, Richard A. Brown, Lt. L. Ward, Sgt.,
O'Connor, Co. Malare, Co. Drown, Norman Bezio,
D. Rock, Lt. Ward, and Karen Bellamy, Defendants.

No. 11 Civ. 2694(SAS).
|
May 3, 2012.

**Attorneys and Law Firms**

LeRoy Peoples, Attica, NY, pro se.

Jeb Harben, Assistant Attorney General, New York, NY,
for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Leroy Peoples, proceeding pro se, brings this
action against, *inter alia:* Brian Fischer, Commissioner
of the New York State Department of Correctional
Services ("DOCS"); Lucien J. Leclaire Jr., Deputy
Commissioner of DOCS; Office of Counsel for DOCS;
William Lee, Superintendent of the Green Haven
Correctional Facility ("Green Haven"); Richard Ward,
a Green Haven Lieutenant; Sergeant K. O'Connor;
Green Haven Correction Officers ("C.O.s") Curtis Drown
and Malare, Norman Bezio, Director of the Special
Housing Unit ("SHU"); David Rock, Superintendent of
the Upstate Correctional Facility ("Upstate"); and Karen
Bellamy, Director of the Inmate Grievance Program
("IGP"), Central Office Review Committee ("CORC")
(collectively, the "defendants"). [1]

Peoples seeks compensatory and punitive damages and
injunctive relief pursuant to section 1983 of Title 42
of the United States Code ("section 1983"). Peoples
alleges that defendants deprived him of rights and
privileges secured by the First, Fourth, Sixth, Eighth,
and Fourteenth Amendments to the United States
Constitution. Specifically, plaintiff brings the following
claims: a Fourth Amendment claim resulting from a
pat frisk and subsequent search of his prison cell;
an Eighth Amendment cruel and unusual punishment
claim resulting from his three-year sentence to SHU
confinement; an Eighth Amendment claim regarding
his altercation with a fellow inmate; a Fourteenth
Amendment due process claim arising in connection with
his disciplinary hearing; and a right of access to the courts
claim under the First and Sixth Amendments.

Defendants now move to dismiss Peoples' remaining
claims pursuant to Federal Rule of Civil Procedure 12(b)
(1) and 12(b)(6) on the following grounds: (1) failure
to state a claim; (2) failure to exhaust administrative
remedies; (3) lack of personal involvement; (4) Eleventh
Amendment immunity; and (5) qualified immunity. For
the reasons discussed herein, defendants' motion is
granted in part and denied in part.

## II. BACKGROUND [2]

Peoples is currently an inmate at Upstate and was
previously an inmate at Green Haven. [3] On October
5, 2009, while Peoples was at Green Haven, Sergeant
O'Connor and CO. Malare approached him while he was
at his industry work program and performed a pat and
frisk search. [4] Peoples was then escorted to his cell, F–
Block 150, where O'Connor and Malare searched his
cell. [5] Peoples alleges that certain papers were seized and
that his personal mail, legal mail, family photos, clothing
and other miscellaneous property was scattered all over
his cell. [6]

Peoples was immediately taken to the SHU. [7] The next
day, October 6, 2009, Peoples was served with the Inmate
Misbehavior Report (the "Report"), which alleged that
he violated rules 107.21 [8] and 113.30 [9] of the Standards
of Inmate Behavior rule book . [10] The Report further
states that on October 5, 2009, prior to the search, CO.
O'Connor was given a packet of papers sent from the

Queens County District Attorneys Office. [11] The cover letter with the materials identified the papers as "U.C.C. [and] other financial claims that are bogus [and] without legal basis." [12] The Report states that the subsequent search of Peoples' cell "produced approx[imately] 148 documents which all also appear to violate the above referenced charges." [13]

**\*2** On October 13, 2009, a misbehavior report hearing was conducted. [14] Peoples alleges that he was walked through the "normal formalities of a hearing." [15] At the end of the hearing, Peoples was sentenced to three years confinement in the SHU, a three-year loss of phone, package and commissary privileges, and seventy-two months recommended loss of good time credit. [16]

Peoples appealed the hearing disposition to SHU Director Bezio who denied his appeal. [17] In November of 2009, while still confined in the SHU and under Superintendent Rock's watch, Peoples was involved in a fist fight with fellow inmate Larry Allen and lost a tooth. [18] In April 2010, Peoples drafted an Article 78 motion addressing some of the issues raised in the instant Complaint. Upon his return from Court, however, the Article 78 motion was confiscated by corrections officers acting under Rock's orders. [19]

On March 7, 2011, Peoples filed a grievance in connection with alleged violations of his constitutional rights. [20] The grievance referenced violations of various Constitutional amendments including the First, Sixth, and Fourteenth Amendments. [21] Peoples complained about the addition of rules 107.21 and 113.30 of the Standards of Inmate Behavior rule book and complained that he was affected by these rules by being placed in the SHU for three years along with three years of lost phone, package and commissary privileges. [22]

On March 9, 2011, Peoples received a response from the Inmate Grievance Review Committee ("IGRC") and simultaneously appealed to the Superintendent of DOCS. [23] On March 15, 2011, Superintendent Rock responded to Peoples' appeal. [24] Two days later, on March 17, 2011, Peoples appealed to the CORC. [25] On

April 18, 2011, Peoples commenced the instant action. On June 8, 2011, he received a response from the CORC. [26]

Peoples generally suffers from "stress, fear ... depression and other psychological impacts" which are side effects from his confinement in the SHU, which he has described as "psychological torture." [27] Peoples alleges that Superintendent Rock was personally involved by continuously and unlawfully confining Peoples in the SHU, upholding the CORC's determination of Peoples' appeal, and being in a supervisory role at the time Peoples was involved in a fist fight with Allen. [28] Similarly, Peoples alleges that Bellamy, the Director of the CORC, was personally involved by virtue of upholding the rules that Peoples challenged, suppressing Peoples' "communication, forbidding access to the court and law books, [and] authorizing the seizure" of Peoples and his papers. [29] SHU Director Bezio was alleged to be personally involved when he "affirmed and confirmed the disposition of unlawful confinement and revoked privileges" in violation of the aforementioned constitutional amendments. [30]

Peoples alleges that Lieutenant Ward was personally involved because he authorized the seizure of Peoples and his papers as well as his unlawful confinement in the SHU. [31] C.O. Drown's alleged personal involvement arises from sentencing Peoples to three years in the SHU with loss of privileges and loss of good time credit. [32]

**\*3** Peoples alleges that Fischer was personally involved because he facilitated the enactment of the rules that Peoples was accused of violating. [33] Peoples also claims that after Fischer learned of the violations of Peoples' constitutional rights, he failed to remedy the situation. [34] Fischer allegedly created the "policy procedure, or custom which violated the constitutional rights and allowed [it] to continue." [35] Similarly, Deputy Commissioner Leclaire's involvement was based on the preparation of the July 24, 2009 memorandum advising Superintendents Lee and Rock of the addition of rules 107.21 and 113.30. [36]

Superintendent Lee's only involvement seems to be that he received the package of materials from the District Attorneys's office and sent them to C.O. O'Connor, which precipitated the search of Peoples' cell. [37] CO. O'Connor's

personal involvement in this action was limited to the search he performed of Peoples' cell and the subsequent preparation of the Report. [38]

## III. LEGAL STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor." [39] The court then evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.* [40] *First,* a court " 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.' " [41] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. [42] *Second,* "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." [43] To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility." [44] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [45] Plausibility "is not akin to a probability requirement," rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." [46]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." [47] However, the court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." [48] A court may also take judicial notice of "the status of other lawsuits in other courts and the substance of papers filed in those actions." [49]

**\*4** Where the plaintiff is proceeding pro se, his pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [50] and must be "interpret[ed] ... to raise the strongest arguments they suggest." [51] These same principles apply to briefs and opposition papers submitted by pro se litigants. [52] Notwithstanding liberal treatment of their pleadings, pro se status does not relieve a plaintiff from satisfying the pleading requirements set forth above. [53]

### B. Leave to Amend the Complaint

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint should be "freely given when justice so requires." [54] A court should not dismiss a pro se complaint for failure to state a claim "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [55] However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." [56]

## IV. APPLICABLE LAW

### A. Section 1983

Section 1983 states, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... [57]

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [58] "The purpose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally

2012 WL 1575302

guaranteed rights and to provide relief to victims if such deterrence fails." [59]

### 1. Personal Involvement

In 1995, the Second Circuit held that the personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicated that unconstitutional acts were occurring. [60]

However, in 2009, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... [Section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [61] "Accordingly only the first and third Colon factors have survived the Supreme Court's decision in *Iqbal.*" [62]

### B. Exhaustion of Remedies

**\*5** The Prison Litigation Reform Act ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." [63] This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [64]

The requirement to exhaust available remedies, "refer[s] to the procedural means, not the particular relief ordered," since "one 'exhausts' processes, not forms of relief." [65] While exhaustion is a prerequisite to suit, the "PLRA exhaustion requirement is not jurisdictional." [66]

DOCS has a well established inmate grievance resolution process. To exhaust their administrative remedies, inmates must complete all three steps. Inmates must:

"(1) file a grievance with the [Inmate Grievance Resolution Committee ("IGRC") ] ...; (2) appeal to the superintendent within four working days of receiving the IGRC's written response ...; and (3) appeal to the CORC in Albany, New York within four working days of receipt of the superintendent's written response." [67] The CORC then has thirty days to review the appeal and render a decision on the grievance. [68]

Additionally, the Second Circuit has held that "the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." [69] As noted by the Second Circuit, "[u]ncounselled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading." [70] The "PLRA's exhaustion requirement ... require[s] that prison officials be 'afford[ed] ... time and opportunity to address complaints internally." [71] "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." [72]

An appeal is not exhausted until an inmate appeals to the CORC and receives a final decision regarding his grievance. [73] The Second Circuit, however, has recognized that in some situations a prisoner who has failed to fully exhaust administrative remedies may survive a motion to dismiss. In *Hemphill v. New York,* [74] the Second Circuit announced a three-part inquiry "appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." In examining a complaint the court should determine:

[*First,*] whether administrative remedies were in fact 'available' to the prisoner. [*Second* ], ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [*Third* ], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that

the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements. [75]

**\*6** As noted by the Second Circuit in *Hemphill,* where an inmate does not receive a response to a grievance, there may be a question as to whether further administrative remedies are available. [76] As noted by the Supreme Court "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." [77] When a prisoner "complie[s] with all of the administrative requirements and ma[kes] a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has ... neglected ... to issue a final administrative determination." [78]

### C. Favorable Termination Rule

The favorable termination rule provides that a section 1983 plaintiff who brings a claim that would implicate the validity of his conviction or sentence, must first prove that the conviction or sentence was vacated or reversed. [79] However, this rule does not bar prisoners from bringing section 1983 claims with respect to the conditions of their confinement that do not implicate the validity of their underlying sentence. When a section 1983 claim is made, the court must:

consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed. [80]

A section 1983 claim implicating the deprivation of good-time credits can be brought only if the good-time credit sanction has been invalidated. [81] However, in this Circuit, a prisoner who receives mixed sanctions affecting both the duration and conditions of confinement at

a prison disciplinary hearing can proceed to challenge those sanctions, as long as the inmate agrees to waive any challenge to the sanction affecting the length of his confinement. [82]

### D. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and officials acting in their official capacity from suit under section 1983. [83] Generally, a suit may "not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity." [84] " '[It] does not protect [an official] from personal liability if ... sued in his 'individual' or 'personal' capacity.' " [85]

### E. Qualified Immunity

Agency officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " [86] The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." [87]

**\*7** To prevail on a motion to dismiss claiming qualified immunity "[n]ot only must the facts supporting the defense appear on the face of the complaint, but as with all Rule 12(b)(6) motions ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." [88]

### F. Access to the Courts

"[P]risoners have a constitutional right of access to the courts" that is "adequate, effective, and meaningful." [89] To establish a constitutional violation based on denial of access to the courts, a plaintiff must show "actual injury." [90] "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." [91] *Bounds v. Smith* does not "guarantee inmates

the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." [92] Meaningful access requires that inmates be provided the tools they need "in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." [93] The "[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." [94]

### G. Procedural Due Process

In order to maintain a due process claim with respect to a prisoner's disciplinary proceeding, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." [95] A prisoner can only establish a due process claim in connection with prison disciplinary proceedings resulting in segregative confinement or loss of privileges by demonstrating that the sanctions "impose[d] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [96] "The duration of SHU confinement is a relevant, but not the only, factor with respect to whether such confinement is 'atypical.' " [97] "Generally, periods of confinement in SHU lasting fewer than 101 days have been found not to amount to atypical and significant hardship." [98] The Second Circuit has held that confinement in the SHU for a period of 305 days, without anything more, satisfies the *Sandin* standard of atypical and significant hardship. [99]

With respect to process, "[f]or a prison disciplinary proceeding to provide due process there must be, among other things, 'some evidence' to support the sanction imposed." [100] Additionally, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." [101]

### H. Fourth Amendment Right to Be Free from Unreasonable Search and Seizure

"While persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights." [102] "These constraints on inmates, and in some cases the complete withdrawal

of certain rights, are 'justified by the considerations underlying our penal system.' " [103] "The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities ... chief among which is internal security." [104] In fact, the Supreme Court has repeatedly "confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " [105] "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." [106]

### I. Eighth Amendment Violations

**\*8** "[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." [107] However, not every incident causing injury "translates into constitutional liability for prison officials responsible for the victim's safety." [108] Thus, a plaintiff alleging a violation of the Eighth Amendment is required to establish two elements. *First,* that he is incarcerated under conditions posing a substantial risk of serious harm. [109] *Second,* that the prison officials had a sufficiently culpable state of mind, or at the very least that they were deliberately indifferent. [110] The first element is objective while the second element is subjective. The Supreme Court has held that to demonstrate deliberate indifference, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [111]

## V. DISCUSSION

### A. Access to the Courts

Peoples' claim that his right of access to the courts was violated is dismissed. Peoples has failed to allege that he was denied tools needed to attack his sentence directly or collaterally, which is the right he is constitutionally guaranteed. [112] Peoples alleged that defendants actions violated his right to instigate a special court proceeding under the Uniform Commercial Code for commercial purposes. [113] However, the right to institute such

proceedings is not the type of meaningful access to the courts that is protected. [114] As Peoples has failed to allege that he has been deprived of the right of meaningful access to the courts and that he suffered actual injury, this claim is dismissed.

### B. Fourth Amendment Claims

Peoples' claims relating to alleged violations of his Fourth Amendment rights to be free from unreasonable searches and seizures are similarly dismissed. Peoples has not pled factual allegations that allow this Court to find that the pat frisk search or the search of Peoples' cell were not reasonably related to legitimate penological interests. As a result, Peoples' claims arising from the alleged violations of his Fourth Amendment rights are dismissed.

### C. Fourteenth Amendment Claims

Defendants have argued that Peoples' due process claim is barred because of the favorable termination rule, which provides that a prisoner cannot bring a section 1983 claim if a judgment in his favor would imply the invalidity of his conviction or sentence, unless the "conviction or sentence has been reversed." [115] This rule applies to Peoples' challenge to his loss of good time credit. [116] Thus, Peoples' due process claim can only proceed if he agrees to waive any challenge to any sanction affecting the length of his confinement, including the loss of good time credit. [117]

Peoples has adequately pled a protected liberty interest, [118] and that he was deprived of his liberty as a result of insufficient process in that there is no evidence to support the sanction of three years in the SHU. However, Peoples has not waived any challenge to the loss of his good time credit. If he were to waive the challenge to the loss of good time credit, Peoples' due process claim could proceed as it would no longer implicate the length of his underlying criminal conviction. Accordingly, until Peoples waives his challenge to the loss of good time credit, his due process claim is dismissed.

### D. Eighth Amendment Claims

**\*9** Peoples' Eighth Amendment claim is dismissed to the extent it is based on his altercation with Larry Allen. Peoples has not alleged any facts that would allow this Court to infer that the prison officials acted with deliberate indifference, in connection with this altercation. [119]

However, Peoples states a viable Eighth Amendment claim based on his three-year sentence in the SHU. As previously discussed, three years in the SHU is an extraordinary amount of time. Construing the allegations in Peoples' Complaint liberally, Peoples has adequately pled that he was incarcerated under conditions that pose a substantial risk of harm. Additionally, Peoples' allegations that the defendants were deliberately indifferent is plausible given the length of his confinement in the SHU. Accordingly, Peoples' Eighth Amendment claim in connection with his sentence of three years confinement in the SHU, together with the other loss of privileges, may proceed.

### E. Exhaustion of Remedies

Defendants' argument that plaintiff has failed to exhaust his administrative remedies fails. [120] Peoples complied with all of the DOCS's procedural rules, thereby giving DOCS a fair opportunity to consider his grievance. [121] Peoples made his final appeal to the CORC on March 17, 2011. [122] Pursuant to New York State Regulations, the CORC had thirty days to respond. [123] The final denial of his appeal was issued on June 8, 2011. [124] Had the CORC timely provided a response to Peoples' appeal, he would have received a response prior to filing the instant action. Defendants do not contest this fact. Peoples complied with the administrative requirements and made a good faith effort to exhaust. The CORC's failure to timely respond does not bar his claim. [125] Moreover, the CORC has since denied his appeal. [126] Thus, Peoples' claim relating to his three-year confinement in the SHU is deemed to be fully exhausted. [127]

### F. Personal Involvement

Peoples' surviving Eighth Amendment claim must be dismissed as to Fischer, Leclaire, Lee, O'Connor and Bellamy as their personal involvement in unlawfully confining him to the SHU has not been adequately alleged. However, Peoples' claim against Ward, Bezio and Rock, remains as he has pled that these defendants were personally involved. [128]

**Peoples v. Fischer, Not Reported in F.Supp.2d (2012)**
Case 9:17-cv-01227-LEK-ML    Document 26    Filed 07/11/18    Page 37 of 68

2012 WL 1575302

### G. Eleventh Amendment Immunity

Peoples' claims against the Office of Counsel for DOCS are dismissed because that Office is an arm of the State of New York, which has not waived its sovereign immunity. [129]

### H. Qualified Immunity

To succeed on their claim for qualified immunity Ward, Bezio and Rock must show that from the "face of the complaint they did not violate a clearly established right of which they should have known." [130] By sentencing and confining Peoples to the SHU for three years, [131] Ward, Bezio and Rock violated a clearly established right protecting inmates from cruel and unusual punishment. Thus, these defendants are not entitled to the defense of qualified immunity.

### I. Leave to Amend

**\*10** Because Peoples cannot cure his claims against Fischer, Leclaire, Lee, O'Connor and Bellamy due to their lack of personal involvement, the claims against these defendants are dismissed with prejudice and without leave to amend. Furthermore, Peoples may not amend his Complaint as to the alleged Fourth Amendment violations, his right to access to the courts claim, his claim regarding his altercation with a fellow inmate, and his claims against the Office of Counsel for DOCS, as any such amendments would be futile.

Peoples may amend his Complaint in connection with his Fourteenth Amendment due process claim. In order to do so, he must first waive his challenge to the loss of good time credit. Peoples may amend this claim within thirty days of the date of this Order. If Peoples submits a timely Amended Complaint, this Court will review it to determine whether Peoples has adequately pled a Fourteenth Amendment due process claim.

## VI. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. [132] The Clerk of the Court is directed to close this motion [Docket No. 33]. A status conference has been scheduled for June 12, 2012, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1575302

---

Footnotes

1   Former defendants Peter A. Crusco, Eric C. Rosenbanm and Richard A. Brown were previously dismissed in this Court's December 1, 2011 Opinion and Order. Additionally, a review of the docket sheet indicates that the Complaint ("Compl." or "Complaint") was filed on April 18, 2011. Rule 4(m) of the Federal Rules of Civil Procedure provides that if a defendant is not served within 120 days after a complaint is filed, the claims may be dismissed without prejudice. Because Malare has not been served to date, the claims against him are dismissed without prejudice pursuant to Rule 4(m).

2   These facts are drawn from Peoples' Complaint and the exhibits annexed thereto. In addition, because Peoples is proceeding pro se, the factual allegations made in his Opposition to Motion to Dismiss dated January 5, 2012 ("Pl.Opp."), together with the exhibits annexed thereto, will be treated as part of the Complaint to the extent they are consistent with the Complaint. See Gill v. Mooney, 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim).

3   See Compl., I(A) and II(A).

4   See id. III(D) ¶ 2.

5   See id.

6   See id. ¶¶ 1, 11.

7   See id. ¶ 2.

8   See id. Rule 107.21 states that "[a]n inmate shall not file or record any document or instrument of any description which purports to create a lien or record a security interest of any kind against the person or property of any officer or employee of the Department, the State of New York, or the United States, absent prior written authorization from the superintendent or a court order authorizing such filing." 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 6.

9    Rule 113.30 provides that "[a]n inmate shall not possess any Uniform Commercial Code (UCC) Article 9 Form, including but not limited to any financing statement, ... correction statement ..., or information request whether printed, copied, typed or hand written, or any document concerning a scheme involving an inmate's 'strawman.' " *Id.*

10    *See* Report, Ex. A to Compl., at 1.

11    *See id.*

12    *Id.*

13    *Id.*

14    *See* Compl., III(D) ¶ 3.

15    *Id.*

16    *See id. See also* Superintendent Hearing Disposition Report, Ex. A to CompL, at 2. At the time of the hearing, Peoples had not yet accrued seventy-two months of good time credit. *See* Compl., III(D) ¶ 3.

17    *See id.* ¶ 4.

18    *Id.* ¶¶ 8, 9.

19    *See id.* ¶ 17(g).

20    *See* 3/7/11 Inmate Grievance, Ex. A to Compl., at 4.

21    *See id.*

22    *See id.*

23    *See* Compl., III(D) ¶ 8. *See also* 3/9/11 IGRC Response, Ex. A to Compl., at 5.

24    *See* 3/15/11 Response from Inmate Grievance Program Superintendent, Ex. A to Compl., at 6.

25    *See id.*

26    *See* CORC's 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

27    Compl., III(D) ¶¶ 7, 9.

28    *See id.* ¶¶ 1, 8.

29    *Id.*

30    *Id.* ¶ 4.

31    *See id.* ¶¶ 1, 10.

32    *See id.* ¶ 1.

33    *See id.* ¶ 14.

34    *See id.*

35    *Id.*

36    *See id.* ¶ 5. *See also* 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 7.

37    *See* Compl., III(D) ¶ 1.

38    *See id.* ¶¶ 1, 2.

39    *Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 128 (2d Cir.2011) (quotation marks and citation omitted).

40    556 U.S. 662, 679 (2009).

41    *Hoyden v. Patterson,* 594 F.3d 150, 161 (quoting *Iqbal,* 556 U.S. at 664). *Accord Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010).

42    *Iqbal,* 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

43    *Id.* at 670. *Accord Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 124 (2d Cir.2010).

44    *Twombly,* 550 U.S. at 564.

45    *Iqbal,* 556 U.S. at 678 (quotation marks and citation omitted).

46    *Id.* (quotation marks and citation omitted).

47    *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)).

48    *Id.* (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)). *Accord Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 156 (2d Cir.2006).

49    *Schenk v. Citibank/Citigroup/Citicorp,* No. 10 Civ. 5056, 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester–Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 205 n. 4 (2d Cir.2003)).

50    *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

2012 WL 1575302

51    *Burgos,* 14 F.3d at 790.

52    See *Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003); *Burgos,* 14 F.3d at 790.

53    See *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995) ("Failure to comply with Rule 8(a) may result in dismissal of a complaint, even if the pleader is proceeding pro se.") (citing *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972)).

54    Fed.R.Civ.P. 15(a).

55    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotation marks and citations omitted).

56    *Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003).

57    42 U.S.C. § 1983.

58    *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). *Accord Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002) (" '[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.' ") (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617 (1979)).

59    *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).

60    See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

61    *Iqbal,* 556 U.S. at 677 (citations omitted) (explicitly rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

62    *Spear v. Hugles,* No. 08 Civ. 4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009).

63    42 U.S.C. § 1997e(a).

64    *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

65    *Booth v. Churner,* 532 U.S. 731, 739 (2001).

66    *Woodford v. Ngo,* 548 U.S. 81, 101 (2006).

67    *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

68    See 7 N.Y.C.R. § 701.5.

69    *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).

70    *Id.*

71    *Id.* (quoting *Porter,* 534 U.S. at 524–25).

72    *Johnson,* 380 F.3d at 697.

73    See *Par tee v. Grood,* No. 06 Civ. 15528, 2007 WL 2164529, at *3 (S.D.N.Y. July 25, 2007), *aff'd sub nom, Par tee v. Wright,* 335 Fed. App'x 85 (2d Cir.2009).

74    380 F.3d 680, 686–91 (2d Cir.2004).

75    *Id.*

76    See *id.* at 690, n. 6 (citing *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002) ("agree[ing with other circuits] that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable"); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002) (stating that prison's failure timely to respond renders administrative remedies unavailable); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001) (holding that defendants failed to prove non-exhaustion where they presented no evidence to refute plaintiff's contention that he could not pursue grievance further after warden did not respond to his grievance); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998) (holding that "available administrative remedies are exhausted when the time limits for the prison's response set forth in the prison Grievance Procedures have expired")). *See also Whitington v. Ortiz,* 472 F.3d 804, 807–08 (10th Cir.2007) ("[A] prisoner cannot be required to wait indefinitely for a response to his final grievance before he may seek judicial review. That is, when prison officials fail to timely respond to a grievance, the prisoner has exhausted 'available' administrative remedies under the PLRA."); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004); *Sergent v. Norris,* 330 F.3d 1084, 1085 (8th Cir.2003) (recognizing that officials' failure timely to respond to grievance could be basis for prisoner to show he exhausted available administrative remedies).

77    *Woodford,* 548 U.S. at 95.

78    *Torres v. Carry,* 672 F.Supp.2d 338, 345 (S.D.N.Y.2009).

79    *Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994).

80    *Id.* at 487.

81    See *Edward v. Balisock,* 520 U.S. 641, 645 (1997).

82    See *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006).

2012 WL 1575302

83  *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself.").

84  *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 684 (1982).

85  *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009) (quoting *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

86  *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

87  *Id.* (quotation marks and citations omitted).

88  *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal citations omitted). *Accord Percinthe v. Julien,* No. 08 Civ. 893, 2008 WL 4489777, at *3 (S.D.N.Y. Oct. 4, 2008).

89  *Bounds v. Smith,* 430 U.S. 817, 821–22 (1977).

90  *Lewis v. Casey,* 518 U.S. 343, 349 (1996).

91  *Id.* at 351.

92  *Id.* at 355.

93  *Id.*

94  *Id.*

95  *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001).

96  *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

97  *Alicea v. Howell,* 387 F.Supp.2d 227, 231 (W.D.N.Y.2005) (citing *Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004)).

98  *Dawkins,* 646 F.Supp.2d at 606. *Accord Ortiz,* 380 F.3d at 655 (prison conditions such as "solitary confinement for twenty-three hours a day, provid[ing] one hour of exercise in the prison yard per day, and permitt[ing] two showers per week" for less than 101 days does not amount to atypical and significant hardship).

99  *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) ( "Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.* ").

100  *Ortiz,* 380 F.3d at 655 (quoting *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001)).

101  *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff v. McDonnell,* 418 U.S. 539, 570–71 (1974)); *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990) ("[A]n impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen.").

102  *Hudson v. Palmer,* 468 U.S. 517, 524 (1984) (citing *Bell v. Wolfish,* 441 U.S. 520, 545 (1979)).

103  *Id.* (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)).

104  *Id.* (internal citations omitted).

105  *Florence v. Board of Chosen Freeholders of the County of Burlington,* 566 U.S. ——, 132 S.Ct. 1510, 1515 (2012).

106  *Hudson,* 468 U.S. at 526.

107  *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

108  *Id.* at 834.

109  *See id.*

110  *See id.*

111  *Id.* at 837.

112  *See Lewis,* 518 U.S. at 355.

113  *See* Compl., III(D) ¶ 5.

114  *See Lewis,* 518 U.S. at 355 ("[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration").

115  *Heck,* 512 U.S. at 487.

116  *See Edward,* 520 U.S. at 645.

117  *See Peralta,* 467 F.3d at 104.

118  *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin"* ).

119  *See Farmer,* 511 U.S. at 834–37. Additionally even if he had made these allegations, Peoples' claim in relation to his altercation with Allen would still be dismissed as he has not exhausted his administrative remedies in connection with this claim.

120    To the extent defendants sought to dismiss the claims based upon lack of subject matter jurisdiction because they claim Peoples failed to exhaust his remedies, it should be noted that the PLRA is not a jurisdictional requirement. *See Woodford, 548 U.S. at 101.*

121    *See id. at 95.*

122    *See* Appeal Statement, Ex. A to Compl., at 6.

123    *See* 7 N.Y.C.R. § 701.5.

124    *See* 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

125    *Cf. Torres, 672 F.Supp.2d at 345.* It is unclear how long an inmate must wait after not receiving a response from the CORC before he can commence a section 1983 action. However, when an inmate has complied with all administrative requirements and waited for the response period to expire, he has exhausted all the administrative remedies that are available to him. Peoples should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief.

126    *See* 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

127    *See Canedy v. Liberty Mut. Ins. Co., 126 F.3d 100, 103 (2d Cir.1997)* (holding that where facts are not contested by either party, the pleading may be deemed amended).

128    As there is no indication that the Attorney General's office represents Drown, I decline to dismiss him from this action. Additionally, because Drown was the officer who imposed the three-year SHU sentence, it is unlikely that he would be dismissed at this stage of these proceedings.

129    *See Treasure Salvors, Inc., 458 U.S. at 684.*

130    *Percinthe,* 2008 WL 4489777, at *3. *Accord McKenna,* 386 F.3d at 436 (internal citations omitted).

131    This is an extraordinary amount of time given the nature of the charges filed against him.

132    If Peoples wishes to purse the claims described in his February 13, 2012 letter to this Court, he should do so by commencing a new action.

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report,
Recommendation and Order dated February 27, 2007
recommended

that defendants' motion for summary judgment
dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim
be DISMISSED in its entirety, and further that all
remaining claims be DISMISSED as against defendants
Goord, Roy, Plescia and Miller, but that it otherwise be
DENIED, and that the matter proceed with regard to

plaintiff's constitutional claims against defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the
Report-Recommendation. When objections to a magistrate
judge's Report-Recommendation are lodged, the Court
reviews the record *de novo. See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate [judge]. The
[Court] may also receive further evidence or recommit the
matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Peebles for the reasons stated in the
February 28, 2007 Report-Recommendation with one
modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 20] is **GRANTED in part and
DENIED in part.** Plaintiff's legal mail claim is
**DISMISSED in its entirety.** Further all remaining claims
against Defendants Goord, Roy, Plescia and Miller are
**DISMISSED.** The motion is denied with regard to
Plaintiff's constitutional claims against Defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility, but Defendants are
**granted leave to renew** the motion following a period of
discovery. Accordingly, Defendants may assert in their
renewed motion, should they decide to file one, that
Plaintiff failed to exhaust his administrative remedies by
failing to promptly file a grievance once at Groveland
Correctional Facility.

**IT IS SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

**\*2** In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]

> FN1. The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of

an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e); *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997). As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees, including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by

defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.<u>FN2</u> Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> <u>FN2.</u> Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July 22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Complaint (Dkt. No. 2) Exhs. 9, 17.

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness.[FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶ ¶ 5-6.

> FN3. DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.[FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.[FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> FN4. This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> FN5. Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e. g., Rashidi,* 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953).

FN6. That rule provides, in relevant part, that

[w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.

Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius,* No. 05-CV-6021, 2006 WL559253, at \*1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and, concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in connection with the pending motion. *See Rashidi,* 818 F.Supp. at 1355-56.

B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004)*. A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005)* (citing *Anderson)*. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999)* (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313

F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511* (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

### C. Failure to Exhaust Administrative Remedies

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004)* (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

**\*8** The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently

available to him under the IGP.[FN8]

> FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, had he done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez,* 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

FN9. As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

FN10. Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

1. *Availability Of Administrative Remedies*

*9 Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**\*10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's

attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust. [FN11]

> [FN11.] It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*see also Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be granted because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

*11 In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

### 2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

### IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681*etseq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule.
*See,e.g.,Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

### INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d
Cir.1999); see also Batista v. Walker, 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> FN1. Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt". [FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore
**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT